# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 09/16/2019 12:05 PM Sherri R. Carter, Executive Officer/Clerk of Court, by H. Flores-Hernandez, Deputy Clerk
19STCV32942

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

G/O MEDIA, INC., a Corporation; GREAT HILLS PARTNERS, a
Partnership; and DOES 1-50, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

NADINE JARRARD, an individual

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Superior Court, Los Angeles County

Stanley Mosk Courthouse
111 North Street, Los Angeles 90012

CASE NUMBER:
*(Número del Caso):*

1 9 S T C V 3 2 9 4 2

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Claire Cochran, 100 Pine Street, Suite 1250, San Francisco, CA 94111, (415) 580-6019

DATE: 09/16/2019                                      Clerk, by Sherri R. Carter Executive Officer / Clerk of Court , Deputy
*(Fecha)*                                            *(Secretario)* Heather A. Flores-Hernandez          *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* G/o Media, Inc., a Corporation

under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. July 1, 2009)

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

Electronically FILED by Superior Court of California, County of Los Angeles on 09/16/2019 12:05 PM Sherri R. Carter, Executive Officer/Clerk of Court, by H. Flores-Hernandez,Deputy Clerk

Case 2:19-cv-09557   Document 1-1   Filed 11/06/19   Page 3 of 27   Page ID #:13
19STCV32942
Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Yolanda Orozco

Claire E. Cochran (SBN 222529)
Natalie Xifo (SBN 280930)
**LAW OFFICES OF CLAIRE COCHRAN, PC**
100 Pine Street, Ste 1250
San Francisco, CA 94111
Telephone: (415) 580-6019
Email: claire@clairecochranlegal.com

Attorneys for Plaintiff NADINE JARRARD

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

[UNLIMITED JURISDICTION]

| | |
|---|---|
| NADINE JARRARD, an individual,<br><br>          Plaintiff,<br><br>     vs.<br><br>G/O MEDIA, INC., a Corporation; GREAT HILL PARTNERS, a Partnership; and DOES 1-50, inclusive,<br><br>          Defendants. | Case No.: 19STCV32942<br><br>**PLAINTIFF'S COMPLAINT FOR DAMAGES FOR:**<br><br>  **(1) VIOLATION OF EQUAL PAY ACT IN VIOLATION OF LABOR CODE SECTION 1197.5**<br>  **(2) GENDER DISCRIMINATION IN VIOLATION OF FEHA;**<br>  **(3) FAILURE TO PREVENT DISCRIMINATION IN VIOLATION OF FEHA;**<br>  **(4) CONSTRUCTIVE DISCHARGE IN VIOLATION OF FEHA;**<br>  **(5) NEGLIGENT HIRING AND RETENTION;**<br>  **(6) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**<br>  **(7) NEGLIGENT INFLICTION OF EMOTIONAL STRESS;**<br><br>**REQUEST FOR PUNTIVE DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

**JARRARD COMPLAINT**

Plaintiff alleges:

<u>PARTIES</u>

1.     Plaintiff, NADINE JARRARD, (hereinafter "Plaintiff" or "JARRARD") is a resident of Los Angeles, California.  At all relevant times herein, Plaintiff was employed by Defendant G/O MEDIA, INC., formerly FMG Media, Inc. and the Onion, Inc. located at 2 West 17th Street, New York, New York.

2.     Defendant G/O MEDIA, INC., (hereinafter "Defendant" or "G/O MEDIA") is a collection of digital-first brands including Gizmodo, Jalopnik, Jezebel, Deadspin, Splinter, Lifehacker, Kotaku, The Root, The Onion, ClickHole, The A.V. Club, The Takeout, and deals.kinja.com.  On information and belief, Plaintiff asserts that G/O MEDIA is located at 1540 Broadway, 27th Floor, New York, New York, 10036.

3.     Defendant GREAT HILL PARTNERS (hereinafter "Defendant" or "GREAT HILL") is a private equity partner that purchase FMG Media and the Onion, Inc. and formed G/O Media, Inc.  Great Hill is located at 200 Clarendon Street, 29th Floor, Boston, Massachusetts, 02116.

4.     Plaintiff is ignorant of the true names and capacities of the defendants who are sued herein as DOES 1 through 50, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained.  Plaintiff is informed and believes, and thereon alleges, that each of said fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries as herein alleged were proximately caused by such unlawful conduct.

5.     Plaintiff is informed and thereon alleges that Defendants, and each of them, at all relevant herein, were the agents and/or employees of their co-defendants, and in doing the things alleged in this complaint were acting in the course and scope of such agency and/or employment.  Defendants, and each of them, are the employers of the managers and supervisors herein complained of, and supervising over Plaintiff, and therefore Defendants, and each of them, are liable for the discriminatory and harassing acts conducted by their agents, employees and supervisors, under the theory of Respondeat Superior.

   ///

JURISDICTION & VENUE

6.      Plaintiff brings this action pursuant to and under the provisions of the Fair Employment and Housing Action, California Government Code §§ 12940 *et seq.* (hereinafter referred to as FEHA), California Labor Code, California Constitution, Article I, § 1; and other common and statutory laws.

7.      The amount in controversy exceeds the minimum jurisdictional threshold of this Court.

8.      At all times set forth herein, Defendants have employed 5 or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year and is otherwise subject to the provisions of FEHA and other applicable laws.

9.      Defendants, and each of them are, and at all times relevant hereto, have been "employers" as defined by FEHA.

10.     Jurisdiction is proper pursuant to California Code of Civil Procedure § 410.10.

11.     Plaintiff is informed and believes, and thereon alleges, that most of the witnesses and evidence relevant to this case are located in Los Angeles County in California and at other locations in the State of California.

12.     Plaintiff is informed and believes, and thereon alleges, that the relative costs and burdens to the parties herein favor the filing of this lawsuit in this Court.  Defendants suffer no burden or hardship by having to defend this case in this Court.  However, Plaintiff would severe and undue burden and hardship if she were required to file in an alternative forum, if any such forum exists.  Such burden and hardship on Plaintiff includes, but is not limited to, prohibitive monetary expenses for travel, obtaining counsel in a different venue and/or jurisdiction, increased expenses to investigate and obtain evidence and depose and interview witnesses.

13.     State policy favors jurisdiction and venue in the County of Los Angeles, California because the State of California has a policy of protecting California residents and ensuring the applicability of FEHA, and other applicable California laws.

14.     Venue is proper in this Court because the acts and events set forth in this Complaint occurred in whole or in part in the county of Los Angeles, California.

EXHAUSTION OF ADMINISTRATIVE REMEDIES

15.     Plaintiff has exhausted all of her necessary administrative remedies with the appropriate

**JARRARD COMPLAINT**

government agencies including the Department of Fair Employment and Housing.  She has received her Notice of Right to Sue, attached as Exhibit A.

### GENERAL FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

16.     Plaintiff re-alleges and incorporates herein by reference all preceding paragraphs as though fully set forth herein.

### PLAINTIFF AND THE BEGINNING OF G/O MEDIA

17.     In May 2017, Plaintiff began working with FMG Media at the time a subsidiary of Univision Group Media Group, as Vice President of West Coast Sales.  Plaintiff was and is very successful in her role.  While at FMG Media, Plaintiff increased profits two-fold.  She turned around an underperforming territory; hired, trained and coached a team of junior salespeople; and built a highly successful West Coast territory.  Plaintiff also has turned around clients who had previously blacklisted the publications in her book.  She turned zero-dollar accounts into million-dollar business.

18.     On April 8, 2019, GREAT HILL acquired Gizmodo Media Group and The Onion, merging the assets to form G/O MEDIA.  This was a highly anticipated acquisition as the companies were struggling under the prior ownership.

19.     At the time, the sales department was compromised of approximately 25 people.  There was one central Senior Vice President of Operations – Kurt Mueller.  Mueller worked closely with three Vice Presidents of Sales for the regions of West Coast, Midwest and East Coast.  They had various support personnel for the salesforce, from Lindsay Eckert, the VP of Strategy, and her team who provide collateral, planning and inventory support. The Head of Staff, Katie Pontius, who had been with the organization for over 9 years. Christine Murphy was leading the creative studios as Executive Director.  Before the acquisition, they were a relatively diverse organization of individuals managing a vibrant new organization, excited for a new home.  This did not remain after the acquisition.  Of the people identified in this paragraph, all four are now gone.

20.     Nearly two months before the acquisition, in February 2019, PLAINTIFF was brought into a call with the (former) EVP Sales for FMG and CEO of Onion, Inc., Mike McAvoy, the SVP of Operations, Mueller, and Jim Spanfeller.  At this time, PLAINTIFF was aware that Spanfeller was expected to be the incoming CEO for the newly formed company.

**JARRARD COMPLAINT**

21.     On this call, Spanfeller spoke to PLAINTIFF as the VP of West Coast Sales.  There were only three vice presidents of sales for the United States, divided into three regions. PLAINTIFF shared with Spanfeller her present opportunities for her area, as well as ideas for expansion. During the time of this call, PLAINTIFF's territory was all of California, the Pacific Northwest and Colorado.  As a growth opportunity, PLAINTIFF shared her idea of hiring a sales associate on her team in San Francisco and then, potentially, Seattle.  Based on her understanding of the numbers and during the call, it was recognized that the areas of focus in sales would be the Midwest and East Coast.

22.     PLAINTIFF left the call much encouraged by the new direction.  She had no idea the devastation that was coming.

LIFE AFTER THE ACQUISITION FOR THE COMPANY

23.     During the week of April 15, 2019, subsequent to the acquisition, Spanfeller addressed the entire company at a town hall meeting.  It was immediately evident that the "new regime" was white men, cronies from Spanfeller's past.  On the stage, there was an absence of women or people of color standing with or part of the Executive Team.  What became quickly evident is that SPANFELLER had no interest in mining the company of existing talent, particularly female, but rather to bring in his old cronies from his time at Playboy, Forbes or elsewhere.

24.     Being the company it was, the question was asked more than once about Spanfeller's plan for diversity.  Twice Spanfeller responded: "I don't know."  The third time he responded: "Haven't thought about it, but I hear you guys. Obviously, diversity is important, I get it."  The *very next day* PLAINTIFF contacted her boss, Mueller, and raised her concerns about the lack of inclusion of women or people of color in management positions.  During this conversation, Mueller assured her that he would pass her voiced concerns along to the GREAT HILL executive team and Spanfeller.  Later that same week, PLAINTIFF spoke to the EVP of Sales, McAvoy, and again voiced her concerns about the lack of diversity.  McAvoy also said that he would discuss this with Spanfeller.

25.     Also raised at the town hall meeting was the question of lay-offs.  Spanfeller said the answer was a solid no.  Nearly two weeks later, layoffs were announced for approximately 9% of the G/O Media staff.

**JARRARD COMPLAINT**

26.     With the layoffs began the termination of female executives and diminishment of job duties.  One of the most shocking of these layoffs was the widely respected Editorial Director and EVP for Gizmodo Media Group, Susie Banikarim, a Persian woman.  Even more troubling was her immediate replacement by Paul Maidment, a member of the new regime – a white male from Spanfeller's past.

27.     During this time period of the acquisition – and even before – a Human Resource department did not exist.  PLAINTIFF's complaints went to the only place she thought would work – her bosses.  And during this time, the Head of Staff, the beloved Katie Pontius, was in the process of a very public and humiliating termination.  And then one month later, her boss, Mueller, was let go.

PLAINTIFF'S DEMOTION, DIMINISHMENT AND DISTRESS

28.     After Mueller was terminated, PLAINTIFF then reported to McAvoy.  On or about June 3, 2019, McAvoy called PLAINTIFF to tell her that Thompson was hired as VP of West Coast Sales. Thompson was another one in the line of the new regime, a white male that worked with Spanfeller beginning at Playboy.  This was the exact same title as PLAINTIFF and, in effect, the same job.  She was shocked.  Then she was told that Thompson would be getting more than half of her territory as she was to pass her clients, contact, and agreements off to Thompson for Northern California, the Pacific Northwest and Colorado.  PLAINTIFF was told to focus solely on Los Angeles.  The territory she had been developing – successfully – for two years (with this company and more years before) was just being handed over to a crony of Spanfeller.

29.     And, to add insult to injury, PLAINTIFF was told that she was now to report to Thompson.  This was a direct deviation from industry practice and PLAINTIFF's job history. During her entire duration of employment, she always reported into a National Head of Sales or Chief Revenue Officer. At this time, PLAINTIFF told McAvoy that this is a blatant case of gender discrimination and she felt like she was most certainly being treated unfairly.

30.     PLAINTIFF did not let this lie there.  She complained repeatedly to McAvoy over conversations and email.  PLAINTIFF understood that these concerns were shared with SPANFELLER. To be clear, PLAINTIFF was not okay with this demotion as she had superseded all sales expectations and surpassed goals in her role for years.  In fact, PLAINTIFF had been managing the West Coast for

**JARRARD COMPLAINT**

over 2 years, with just one other person during much of that period, demonstrating she had no need for additional support or management.

31.     PLAINTIFF also complained about the emotional effect of this demotion.  PLAINTIFF's job diminishment was embarrassing and humiliating when explained to her colleagues, industry friends, and clients. PLAINTIFF has been developing her reputation, client list, industry knowledge and covering the West Coast for over a decade.  For the two years prior, she had been devoting that effort to what is now G/O Media.  She had built valuable agency and advertiser relationships she brought with her and new ones.  And now she was being told to turn it over to Spanfeller's friend and a member of the old white man's club of the new regime.  The only response PLAINTIFF received was that there was new management.

32.     PLAINTIFF, in her complaints to McAvoy, also brought up the loss of income that would necessarily come with this job diminishment.  In fact, she would lose more than half of her earnings with the changing of her territory.  In response, PLAINTIFF was told that her compensation would remain the same.  At this time, the new regime had not passed out the compensation structure so there was nothing to reference.

33.     While PLAINTIFF was seeking answers as to the reasoning behind her demotion, and even what this meant for her future, stories started circulating about other women suffering from same or similar circumstances.  One such story was that one of the cronies, Sean Flanagan – a consultant at the time – tipped a young female Account Manager a $20 bill after completing a simple task for him. The woman reported feeling demoralized and offended. PLAINTIFF and other women complained about this to Mueller and McAvoy as the female Account Manager was incredibly uncomfortable after this happened. Despite his flagrant gender discrimination, Flanagan was promoted to East Coast Vice President a few weeks later. On information and belief, PLAINTIFF is aware that between June 7 and 8, four female executives complained to McAvoy about the tipping incident. McAvoy said he would convey the group's concerns to Spanfeller and the GREAT HILL Executive Team.

34.     On or about June 17, 2019, it was announced that another white male crony, Bruce Rogers, was hired as the new Head of Marketing. On information and belief, PLAINTIFF asserts there were, at a minimum, three highly qualified female internal candidates willing and able to take this job

internally – yet, they were not interviewed or even considered – despite the fact they were exceedingly qualified for the position as well.

35.     PLAINTIFF, and other women at G/O Media, began sharing their stories with each other, specifically how unfairly they were being treated. On information and belief, PLAINTIFF asserts that two other women in the executive staff were not offered to interview for (or promoted to) marketing positions they were clearly qualified to fill. Instead, another old white crony male, Paul Maidment, was offered the position without an internal or external posting of the available job, nor consideration of other candidates within the company. The dismissal of the highly decorated Editor in Chief, Susie Banikaram, and immediate replacement hire, of a white crony male was particularly troubling to the women. During this time, Christine Murphy who was a woman leading the creative studios, was also fired. In addition, Katie Pontius, the FMG Head of Staff, who had been a beloved part of the company for 9 years also experienced diminishment of her role and has left the company as a result. All of this leading to zero female executives within the company.

36.     During the week of June 19, 2019, G/O Media conducted the National Sales Summit, at which several incredibly alarming incidents occurred.

     a.     At the gathering the night before, two female sales representative PLAINTIFF had previously hired onto her team shared a story which they described to be "incredibly inappropriate":

> *When they asked Thompson and Spanfeller how they met, both men told the new hires that when they initially met, in the 90s, Spanfeller had asked Thompson to come up to his hotel room [instead of meeting in the lobby] because he was "too hung over" to come down. When Thompson showed up to his room, Spanfeller was in a bathrobe. The two got along and Spanfeller hired him on the spot. This was how the two men came to be working together at Playboy. The women said they felt uncomfortable about the conversation, that their new bosses shared it with them, and the implications around bathrobe and hotel rooms in the interviewing process. Keep in mind, these women were already*

**JARRARD COMPLAINT**

> *fearing for their jobs under the new management, as so many of their*
> *co-workers had recently been laid off, territories diminished, and*
> *replaced by older white men from outside of the organization,*
> *apparently hired in bathrobes and hotel rooms.*

    b. Spanfeller also mentioned a story in which Harvey Weinstein was in the elevator with him, because their daughters went to school together. It landed flat and offensive for several reasons. Not just because of what "Harvey Weinstein" stands for within the National conversation surrounding the #metoo movement but considering the blatant disrespect being shown to women at G/O Media at the hands of the new regime.

    c. The new G/O leadership demonstrated a complete lack of knowledge and understanding for its' products and offering. When Flannagan, now the East Coast Sales VP, and Thompson presented, the entire sales team was shocked at their lack of knowledge and delivery. For his presentation, Flanagan read directly from the projected slides without adding any context or color. PLAINTIFF has been told by those on his team that Flanagan does not talk or interact with them. In fact, many wonder what Flanagan does all day. Similarly, Thompson's presentation style was similarly lacking in any sales experience, anecdotal or otherwise. He had no grasp of how digital advertising sales works, how to correspond respectfully through agencies, or any grasp of how they had been achieving $10m in sales on a quarterly basis. Additionally, similar complaints about Thompson were raised by a member of PLAINTIFF's team, where they are constantly complaining about his lack of knowledge, how things work and general information around their business. Similarly, complaints about Thompson lack of competency have been raised from the head of strategy, and other sales support staff.

    37.   ***Immediately following the National Sales Summit, three people from the sales team tendered their resignation.***

    38.   Following the Sales Summit, during the week of June 25, PLAINTIFF was told by multiple people on the team that Spanfeller had emailed Brad Klancik (a white male) VP of Midwest, telling him he was valued and Spanfeller was willing to do whatever it took to retain him.  Spanfeller

**JARRARD COMPLAINT**

did not make a similar gesture to any of the females in sales leadership. Neither, did he make a similar call to PLAINTIFF even after the success and revenue she had generated for the company. On information and belief, PLAINTIFF asserts that multiple complaints were filed with McAvoy about Spanfeller's disparate and preferential treatment of the white male Klancik.

39.     During the week of June 28, PLAINTIFF was working on a new deal with HP:Omen – one that she had been solely responsible for identifying, fostering and bringing to the table. Flanagan and Spanfeller learned of the deal. Instead of promoting PLAINTIFF's work with HP:Omen, Flanagan and Spanfeller used their personal relationship with Steve Calder (PLAINTIFF's client) to pass the deal to Thompson.

40.     During the same time period that the HP:Omen deal was taken away from her, PLAINTIFF was told she would no longer be covering the PNW/SF region. Following the cues and directives given by the new regime, she stopped working on it. Soon after, Flanagan began sending multiple emails to PLAINTIFF, asking her to do administrative work for him because he was "traveling with no wifi access" or "didn't know how to use Netsuite". PLAINTIFF was understandably offended by the request. She is and was a VP of Sales and fellow executive but instead was having her territory, clients, deals and finances stripped away and being relegated to an administrative capacity because she is a woman. To add insult to injury, after taking the client and the deal, neither Thompson nor Flanagan followed up with the client after their call and Flanagan publicly blamed PLAINTIFF.

41.     Similarly, around the same time PLAINTIFF's team had a $350,000 Intel deal in progress with its advertising agency, Dentsu. It is common practice in the industry that advertising salespeople call on the agency for new business, respecting the clients' time and intentions to go through their agency for new content – and preserve relationships. Thompson kept going around the appropriate process, calling the client directly. One of PLAINTIFF's sales representatives, was taken aside and the client asked why Thompson kept pursuing her directly when the agency was already working with G/O Media and trying to put a deal together. The client got so annoyed by the Thompson calls that she complained to the agency about his approach and stated that she didn't want to work with him, or G/O Media any longer. The agency stepped in and cancelled the entire buy with G/O Media, a financial loss for G/O Media as well as for PLAINTIFF and her team. On a call with Thompson, PLAINTIFF and the

JARRARD COMPLAINT

sales associate, the associate raised this concern to Thompson and he immediately got defensive. He changed his story several times from saying he did meet with the client, to, he did not meet with the client but talked over email.  The changing of stories is becoming part of working with this new regime. Regardless, the damage was done and the deal and relationship were lost.

42. On July 1, 2019, PLAINTIFF emailed Thompson to discuss a pending Los Angeles territory visit, asking him to align his trip with Spanfeller's so as to avoid unnecessary scheduling challenges in the face of a shortened holiday week, and to maximize the impact of the meetings with her clients. In response, Thompson asked PLAINTIFF to explain to him – in writing – the entire sales history of the West Coast Region, including all accounts, 2018-2019 history, and key players.  This information was readily available in the program Netsuite. Netsuite is one of many softwares available for sales personnel to be the most efficient in generating revenue for the company. When PLAINTIFF began working at the company, she had not used this software before and had to learn it.  Thompson told her he was familiar with a different program and asked her to input and provide summaries of information that was already in the company's accepted software program. Of course, this is not her job. And, even worse, she is not Thompson's administrative assist.  She is also a VP of Sales.

43. Further, Thompson directed PLAINTIFF to prepare introductory and transitional emails which would redirect her client relationships to him. He gave her a 3-business day deadline which coincided with a long holiday weekend. Continuing, Thompson directed PLAINTIFF to compel a Sales Director on her team, to do the same but for his Colorado list of clients.  PLAINTIFF's Sales Director was ordered to pass his sales relationship and opportunities to Lance Johnson, the new regime hire for South Central Sales Territory manager, further reducing PLAINTIFF's territory and income capabilities.

44. On July 2, 2019, McAvoy scheduled a three-way call between himself, PLAINTIFF and Spanfeller, the purpose of which was to discuss PLAINTIFF's position at G/O Media, including her reduced responsibilities and reasons for demotion. During the nearly 30-minute call, PLAINTIFF – again – provided Spanfeller an explanation of her background and experience in the digital advertising industry, including listing accomplishments, most notably, consistently exceeding her sales goals. PLAINTIFF also explained her very successful career thus far, which included her contributing to 3 successful major acquisitions – FOX, Yahoo! (Verizon Media) and Opera Software.  PLAINTIFF

**JARRARD COMPLAINT**

explained her success at raising revenue for the company, despite multiple odds, which included limited budgets, hiring freezes, and more. PLAINTIFF told both Spanfeller and McAvoy that she had initially welcomed the change in ownership because she felt it would allow the organization to grow, and in turn grow her career into a senior leadership position – a due reward for her value and reliability to the organization.  The call addressed the following, with Spanfeller's responses included:

a. <u>Demotion</u>: PLAINTIFF asked no less than three times why she had been demoted. Spanfeller first questioned that it was actually a demotion. PLAINTIFF explained that she had the West Coast, including Colorado. He brought in Thompson, with her same title, and then installed him with more than half of her territory. Spanfeller asked if it was the title and, if so, would it be easier if Thompson had an elevated title such as SVP. PLAINTIFF was shocked. Here, she was a proven asset for the company who generated revenue despite the odds against her and the new CEO was flippantly handing out executive titles to his cronies as he took away her territory and, of course, her income. In fact, as of the date of the filing of this Complaint, Thompson's title is now Regional Vice President of West & South – the same territory and work PLAINTIFF  was doing but now with a "senior" title. Regarding Thompson, Spanfeller stated that he needed someone in market that had direct client experience – a confusing, and insufficient response given PLAINTIFF's proven success in the market, which she stated to Spanfeller. Further, the longer Thompson is in the position, the more he is relying on PLAINTIFF's relationships to establish a sales presence.  The hiring of Thompson is in dispute. Further, Spanfeller attempted to distance himself from the hiring of Thompson by stating that McAvoy made this hiring decision.  On the call and to PLAINTIFF, McAvoy stated that the two (Spanfeller and McAvoy) had different understandings of this. Since McAvoy's termination, Spanfeller, blames everything on McAvoy that he possibly can – yet, Thompson still remains.

b. <u>Discrimination against Women</u>: PLAINTIFF brought up discrimination against female executives repeatedly, either by name directly or circumstances. Spanfeller acknowledged that it could "appear" to be discriminatory, but PLAINTIFF should "wait and see", seemingly referencing the token hires that were coming. PLAINTIFF referenced him to the outside recruitment of white men (and cronies) who either took positions of qualified women (ie, Thompson /PLAINTIFF) or that the internal qualified women were not even interviewed. Spanfeller's continued response was that he was not aware

**JARRARD COMPLAINT**

of the women and the talent that existed, and those white men were a known entity to him. Clearly, PLAINTIFF, the female executives and Federal and State laws take issue with this position and contention.

       c.   Administrative Work: PLAINTIFF raised the issue that she, a fellow executive, was being tasked with the administrative work for the new regime. Spanfeller was not immediately responsive about this. Spanfeller seemed to agree that the new sales force should learn the systems. McAvoy agreed this was not okay and he would create a different reporting requirement where PLAINTIFF could report to him, thereby alleviating this issue. And then he was fired. And nothing happened to ameliorate this situation and PLAINTIFF continued to perform administrative tasks for her counterpart.

       d.   Commission Structure: PLAINTIFF asked about her commission structure going forward, and payments on deals that she had brought in, that she now had to pass on to Thompson, due to the unclear change in hierarchy at the newly formed G/O Media. Also, PLAINTIFF stated her concern that if her territory was cut in half (or even less) that her income and commission structure would be as well, and her sales teams. Spanfeller encouraged her by stating that this would not happen and promised she would be "pleasantly surprised" by the commission plan which was forthcoming

    45.   On or about July 11, McAvoy (President and CEO of Onion, Inc.,) was let go and no other communication was presented around why or who would replace him. It was well known among the female sales force employees that McAvoy was an advocate for the women and their growing concerns about their mistreatment. After his termination, McAvoy become Spanfeller's constant scapegoat.  Morale dropped even more.

    46.   During the week of July 15, 2019, PLAINTIFF's senior seller.  He identified as the reason for his resignation an absence of growth opportunities and a general concern for company stability. He had been forced to provide all of his Colorado sales contacts and relationships to a member of the new regime and had also been relegated just to the Los Angeles area. Additionally, he told PLAINTIFF that he had a desire to move up into a more senior sales role, and that the addition of Thompson, above them, stunted his growth opportunities, as it had done hers as well.

47.     On July 17, PLAINTIFF sent Spanfeller a follow up email from the call they had with McAvoy about her questions and concerns. PLAINTIFF reported to him that her highly effective sales representative had left because of lack of growth opportunities. In addition, she raised – again – to Spanfeller questions about her new role, the role of female executives in the company, and her concern about the compensation discussions.  As before, Spanfeller's response did nothing to dissuade her concerns. Not only did he blame McAvoy for not having a compensation plan – 4 months post-acquisition – but noted that Angela Persaud was brought  on as SVP Head of Talent and could address her claims.

G/O MEDIA'S "INVESTIGATION" IS EQUALLY DISCOURAGING

48.     Two days after PLAINTIFF's email exchange with Spanfeller, she was contacted by the new SVP Head of Talent, Persaud.  On July 22, Persaud called PLAINTIFF from her cellphone on her way home to "chat" about the investigation and ask more questions. However, rather than asking her questions or more detail about her concerns, Persaud told PLAINTIFF that the "reorganization" does not appear to be job diminishment (dismissing her concerns about loss of territory, compensation and reputation) and that Spanfeller justified the hiring of Thompson would cut down on the paying for trips back and forth to San Francisco. This justification was beyond ludicrous. PLAINTIFF understood that Thompson now had to fly down to Los Angeles for meetings. Further, Persaud dismissed PLAINTIFF's concerns about the discriminatory manner the female executives were and are being treated after the acquisition. It was not just the complete dismissal of her concerns and the ridiculous justification for stripping a VP of over half of her well-earned and deserved territory but that it was done by one of the remaining few females on the executive team that really upset PLAINTIFF.

49.     It was also made clear that Persaud had no experience of how sales organizations work – she continually asked questions that were extremely surprising from an SVP of HR, like, what is a sales comp? What is a split? Weren't you already reporting into someone like Thompson? She had no idea who Kurt Mueller was or what his responsibilities were. And, yet, rather than investigating and finding out these answers, she categorically dismissed PLAINTIFF's complaints.

50.     As of the date of this letter, PLAINTIFF has not since heard back from Persaud, nor been contacted by an independent investigator. PLAINTIFF has provided Persaud with a version of her

complaints, including the facts detailed in this Complaint.  No real investigation into these claims has been undertaken by the Company, nor has Persaud conducted an appropriate series of related workplace interviews or recommended ameliorative actions. This complete lack of appropriate response to PLAINTIFF's complaints, as well as the systematic stripping of her title, seniority and duties has left her demoralized and riddled with anxiety and depression.

THE FALLOUT HAS BEEN BOTH PERSONALLY AND PROFESSIONALLY DEVESTATING

51.     PLAINTIFF is highly concerned about the manner that business is being handled, which directly impacts both her and her team. This concern is not just the internal changes but the public relations that have come from the management and their decisions.

52.     As for her own sales team, PLAINTIFF lost one of her highly successful sales representatives, as discussed above. One of her female sales representatives was to and had been overseeing Los Angeles and San Francisco. In fact, she was hired into this position with the understanding that fifty percent of her territory would be in San Francisco. However, when Thompson was hired, the female sales associate was told she had to give up her entire San Francisco account list to Thompson, as he was now overseeing San Francisco and Pacific North West. Clearly such a demotion of territory would automatically cut down on her financial possibilities.

53.     Further, basic business requirements have not been communicated, even now, five months after the change in ownership. The new regime has not provided details around compensation structure, management of split accounts, new marketing strategy or hiring objectives. With the release of the latest commission structure, the sales force is being told by management that they need to triple revenue, yet there has been no communication on how to accomplish this. G/O Media currently has only one planner across the entire organization and one strategist, both of whom are also in the dark.

54.     The media frenzy on these issues cannot be emphasized enough as it not only highlights the treatment of the female executives but also creates difficulty for the salesforce in engendering trust and developing business and advertising relationships.  The articles keep coming that have been disparaging, at best, about the new regime and the business.  To date, there has been no internal direction on how to address the issues with advertising clients.

**JARRARD COMPLAINT**

55.     PLAINTIFF found one article to be particularly distressing as it involved her personally and was a blatant fabrication. In the Deadspin article titled "*This is how things work now at G/O Media*" published August 2, 2019, the following was stated:

*"Spanfeller said no one told him that a female VP was already successfully performing that job before he hired Thompson. He did not answer a question about whether he was aware that a female VP was already leading west coast sales or that he installed a man (who also carries a VP title) above her."*

56.     This is a patently false statement. As previously detailed, PLAINTIFF was looped into calls with Spanfeller as early as February 2019 as the acquisition was settling in and Spanfeller was being designated as the new CEO. Spanfeller knew of PLAINTIFF, her position and the work she did with FMG Media **before** the acquisition. PLAINTIFF has evidence of meetings in person, and over email with both Spanfeller and McAvoy. Spanfeller knew that the above was a false statement when he made it, suggesting that this was not the first and likely not the last false statement he is willing to make.

57.     Beyond this, PLAINTIFF cannot maintain a level of consistency from the new regime to begin to understand how to manage her sales team and her new stated goals. For example, Thompson and Spanfeller were clear that PLAINTIFF was limited to the Los Angeles area as her sales territory. However, between August 2 and August 6, not only was she presented with different compensation structure arrangements, but widely varying staffing plans. On August 2, she was told by Thompson to hire a new sales associate in Los Angeles, which she confirmed was not necessary as she already had someone. Then, on August 6, she was told to hire a new sales associate in San Francisco, which was even more confusing as the existing sales associate had just been stripped of that territory! With each change PLAINTIFF becomes more and more confused and concerned about the new regime's lack of knowledge of both the internal company as well as the external market.

58.     Each time there has been a discussion about Thompson it has always about his contacts and relationships that will build the business. This has not been demonstrated in a single instance since he took over PLAINTIFF's position and work. Across the company, THOMPSON comes across as incompetent and out of his depth. He does not understand the systems, process, day-to-day activities, the pitch – nothing. At one point, Thompson was on a call with her sales associate, and he tasked her with

running the entire meeting with the client – from presenting the entire deck to asking for the business. The sales associate raised this issue to PLAINTIFF as she couldn't understand how her boss' boss isn't expected to lead a call with his client contact. To date, Thompson has not brought in any new business, only fostered three requests for proposals from *PLAINTIFF's* clients, and then punted his responsibilities back to PLAINTIFF. Thompson's publicly available work history shows he has been a consultant at his own company for the past 17 years. Experience within G/O Media has shown Thompson has no idea how to put a national compensation and/or team policy together. It is not clear from the months Thompson has been a VP of Sales at G/O Media that he has ever managed a Sales Team. PLAINTIFF has clearly and consistently asked for a plan, in meetings and in emails. Nothing clear has been provided – except to pass off her clients to Thompson and still be tasked with higher revenue requirements.

59.     The current compensation structure and stated goals are impossible on a global basis for the company. In this quarter G/O Media has brought in $1M in insertion orders, a fraction of its $10,000,000 goal. Additionally, to date, close to 20 departures within the sales/sales support organization have taken place. Most of these integral people who have contributed massively to our sales revenue.

60.     As a result of this, PLAINTIFF has suffered and continues to suffer extreme stress and anxiety with mental and physical effects.  PLAINTIFF has and continues to be under the care of doctors to address the physical and mental distress. She has been put on medication. As of August 22, 2019, she has been placed out of work due to the extreme mental and physical distress she is suffering from. PLAINTIFF was advised by her doctors that she would not be able to return to this work environment as it is so damaging physically and emotionally. On September 12, 2019, PLAINTIFF informed DEFENDANTS that she was not able to continue in this work environment and had therefore been constructively discharged.

## FIRST CAUSE OF ACTION

(Violation of Equal Pay Act, Labor Code § 1197.5(a))

[Against G/O MEDIA and GREAT HILL]

63.     PLAINTIFF re-alleges and incorporates herein by reference all prior paragraphs as

though fully set forth herein.

64.     At all relevant times, Labor Cod section 1197.5 was in effect and was binding on DEFENDANTS.  This statute prohibits DEFENDANTS from paying any individual at a lower rate than employees of a different race in the same establishment for equal work requiring equal skill, effort, and responsibility and performed under similar working conditions.

65.     DEFENDANTS violated these laws by failing to pay PLAINTIFF at the same rate as her white male counterparts.  PLAINTIFF, a VP of Sales, asserts that she is being paid less as white male employee of her same title, although she had equal skill, effort and responsibility under similar working conditions.  PLAINTIFF's compensation was based, in large part, on commission.  When DEFENDANTS stripped away her territory, clients and agreements, and passed them on to a white male with the same or similar title and responsibilities, PLAINTIFF's compensation was decreased.  PLAINTIFF is asserting that this is the same across the board for DEFENDANTS.  PLAINTIFF complained of this repeatedly and yet nothing was done to discontinue this pay discrepancy except to increase her requirements thereby making it nearly impossible for PLAINTIFF to be profitable or make a comparable wage.

66.     As a proximate result of DEFENDANTS' willful, knowing, and intentional violations of Labor Code section 1197.5, PLAINTIFF has sustained and continues to sustain substantial losses of earnings and wages and other employment benefits.

67.     PLAINTIFF has incurred and continues to incur legal expenses and attorneys' fees.  Pursuant to Labor Code section 1197.5(g), PLAINTIFF is entitled to recover reasonable attorneys' fees and costs in an amount according to proof.

SECOND CAUSE OF ACTION

Discrimination Based on Gender In Violation of Government Code §§ 12940 <em>et seq.</em>

(AGAINST DEFENDANTS)

68.     PLAINTIFF re-alleges and incorporates herein by reference all prior paragraphs as though fully set forth herein.

69.     At all times herein mentioned, G/O MEDIA and GREAT HILL qualified as "employers"

under the California Fair Employment and Housing Act (Government Code § 12940, *et seq.* or FEHA), in that they regularly employed five or more workers.  FEHA requires employers such as DEFENDANTS to refrain from discrimination again, and harassment of, an employee on the basis of their gender.

70.    At all times herein mentioned, PLAINTIFF was an employee of DEFENDANTS.

71.    At all times during Plaintiff's tenure with DEFENDANTS, PLAINTIFF performed her work in an acceptable manner.

72.    DEFENDANTS made numerous decisions based upon PLAINTIFF's gender which adversely affected Plaintiff regarding the terms, conditions and privileges of employment.  Such actions include, but are not limited to, assigning PLANTIFF administrative work, stripping PLAINTIFF of her territory, decreasing PLAINTIFF's income, taking PLAINTIFF's clients and agreements, systemically diminishing and discounting PLAINTIFF and her complaints, and blaming PLAINTIFF for business failures without reason.  DEFENDANTS behavior created a situation so intolerable that she was unable to continue working in this environment.

73.    Plaintiff is informed and believe, and thereon alleges, that PLAINTIFF's gender was a motivating factor in DEFENDANTS' acts as alleged above and incorporated herein by reference.

74.    DEFENDANTS' conduct was extreme and outrageous and was a substantial factor in causing PLAINTIFF's injuries, which include, but are not limited to: loss of income, humiliation, embarrassment, severe mental and emotional distress, and discomfort, all of which amount to PLAINTIFF's damage which totals in excess of the minimum jurisdiction of this court, the precise amount to be proven at trial.

75.    DEFENDANTS committed the acts herein alleged maliciously, fraudulently and oppressively with the wrongful intention of injuring PLAINTIFF and acted with an improper and evil motive amounting to malice, in conscious disregard for PLAINTIFF's rights and thus an award of exemplary and punitive damages, is justified.  Further, supervising employees acted in a deliberate, callous and intentional manner in order to injure and damage PLAINTIFF.  PLAINTIFF is therefore entitled to recover and prayers for punitive damages in an amount sufficient to punish and deter

**JARRARD COMPLAINT**

DEFENDANTS and others for such conduct.

THIRD CAUSE OF ACTION

Failure to Prevent Discrimination, Harassment and Retaliation

(Violation of Government Code § 12940(k))

(Against DEFENDANTS)

76.    PLAINTIFF re-alleges and incorporates herein by reference all prior paragraphs as though fully set forth herein.

77.    At all times herein mentioned, FEHA, Government Code section 12940(k) was in full force and effect and was binding on defendants. This statute states that it is an unlawful employment practice in California for an employer to "fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."

78.    During the course of plaintiff's employment, DEFENDANTS were made aware of PLAINTIFF's complaints of discrimination, harassment, and disparate treatment of other women. DEFENDANTS categorically failed to prevent their employees from engaging in intentional actions that resulted in plaintiff being treated less favorably because of PLAINTIFF's protected status. During the course of PLAINTIFF's employment, DEFENDANTS failed to prevent their employees from engaging in unjustified employment practices against employees in such protected classes. During the course of PLAINTIFF's employment, defendants failed to prevent a pattern and practice by their employees of intentional discrimination and harassment based upon her protected status. Further, DEFENDANT knew of PLAINTIFF's complaints about her treatment, work environment and retaliation and specifically and in writing.  Any investigation done by DEFENDANTS was a mere formality and was not, in effect, an investigation.  In fact, the "investigation, was as equally damaging.

79.    Plaintiff believes, and on that basis alleges, that it was her protected status and engagement in protected activities which were substantial motivating factors in DEFENDANTS and their employees' discrimination and harassment against her.

80.    As a proximate result of DEFENDANTS' willful, knowing, and intentional misconduct, PLAINTIFF has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

81.    PLAINTIFF has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to Government Code section 12965(b), PLAINTIFF is entitled to recover reasonable attorneys'

**JARRARD COMPLAINT**

fees and costs in an amount according to proof.

82.    DEFENDANTS' misconduct was committed intentionally, in a malicious, despicable, oppressive, fraudulent manner, entitling plaintiff to punitive damages against defendants.

<u>FOURTH CAUSE OF ACTION</u>

(Wrongful Constructive Termination of Employment in Violation of Public Policy)

(Violation of FEHA, Government Code § 12940 *et seq.*)

[Against All Defendants]

83.     PLAINTIFF re-alleges and incorporates herein by reference all prior paragraphs as though fully set forth herein.

84.    At all times during her employment with DEFENDANTS, PLAINTIFF performed her duties with the utmost diligence and competence.

85.    PLAINTIFF is informed and believes and thereon alleges that DEFENDANT's decision to harass and discriminate against her, as alleged herein, was motivated by PLAINTIFF's gender. PLAINTIFF is further informed and believes and thereon alleges that any other reasons proffered by DEFENDANTS were and are pretextual in nature.  DEFENDANTS intentionally created the aforementioned discriminating and harassing environment, thereby creating working conditions so intolerable that PLAINTIFF had no alternative but to resign.

86.    By reason of the aforementioned conduct and circumstances, DEFENDANTS and each of them, violated the fundamental public policies of the State of California, as set forth in Section 12940 of the Government Code and California Constutition which mandate that employees be free from unlawful discrimination and harassment.  As a further result of the aforesaid conduct of DEFENDANTS, and each of them, PLAINTIFF has been deprived of her right to a work environment free from discrimination, harassment and retaliation.

87.    By the aforesaid acts and omissions of DEFENDANTS, PLAINTIFF has been directly and legally caused to suffer the harm and damages alleged herein.

88.    PLAINTIFF is informed and believes and thereon alleges that DEFENDANTS, and each of them, committed the actions alleged herein maliciously, fraudulently, and oppressively, with the

**JARRARD COMPLAINT**

wrongful intention of injuring PLAINTIFF and acted with an improper and evil motive amounting to malice, and in conscious disregard of PLAINTIFF's rights.  Because the acts taken towards PLAINTIFF were carried out by managerial employees acting in a despicable, deliberate, cold, callous, and intentional manner in order to injure and damage PLAINTIFF, she is entitled to recover punitive damages from the DEFENDANTS in an amount according to proof.

<u>FIFTH CAUSE OF ACTION</u>

Negligent Hiring Retention & Supervision

(Against GREAT HILL)

89.    PLAINTIFF re-alleges and incorporates herein by reference all prior paragraphs as though fully set forth herein.

90.    At all times relevant herein, GREAT HILL hired SPANFELLER, who was unfit for the position for which he was hired.  SPANFELLER has a reckless and discriminatory disposition and has repeatedly and consistently made discriminatory decisions.

91.    GREAT HILL knew or should have known of SPANFELLER's unfitness.  GREAT HILL intentionally and willfully disregarded SPANFELLER ongoing discriminatory animus, decisions and recruitment of white males to replace women and people of color.  This is not only known internally but has been made public through numerous complaints in the company and in the media.

92.    SPANFELLER's position necessarily brought him into contact with PLAINTIFF.  In rapid succession, SPANFELLER, on his own and through the hiring of Thompson, destroyed what PLAINTIFF had built up over the past two years.  PLAINTIFF complained.  Others complained. GREAT HILL chose to retain SPANFELLER, despite this knowledge.

93.    While in the course and scope of his employment with GREAT HILL, SPANFELLER harmed PLAINTIFF with conduct which was known, supported and ratified by and/or encouraged by GREAT HILL.  Such conduct is illustrated in great detail in the paragraphs above.

94.    As a direct and proximate result of GREAT HILL's breach of duty to PLAINTIFF, PLAINTIFF was damages in an amount to be proven at trial.

///

**JARRARD COMPLAINT**

## SIXTH CAUSE OF ACTION

Intentional Infliction of Emotional Distress

(Against All Defendants)

95.   PLAINTIFF re-alleges and incorporates herein by reference all prior paragraphs as though fully set forth herein.

96.   DEFENDANTS engaged in outrageous and unprivileged conduct that PLAINTIFF is informed and believes was intended to cause her harm.  Alternatively, DEFENDANTS acted with reckless disregard of the probability that PLAINTIFFS would suffer severe emotional distress as a result of their outrageous conduct as described above

97.   As a direct and proximate result of DEFENDANTS' and each of their outrageous, unprivileged and extreme conduct alleged above, PLAINTIFF suffered severe, substantial and enduring emotional distress, including humiliation, embarrassment, anxiety and indignity, in an amount which will be proven at trial.

98.   In failing to correct, prevent or refrain from said harassing and retaliatory conduct on the part of HUNTER, defendants caused Plaintiff severe harm.  Defendant's and each of their conduct was malicious and oppressive, in willful and conscious disregard of Plaintiff's rights and subjected Plaintiff to cruel and unjust hardship.  Thus, an award of exemplary and punitive damages is justified in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

Negligent Infliction of Emotional Distress

(Against All Defendants)

99.   PLAINTIFF re-alleges and incorporates herein by reference all prior paragraphs as though fully set forth herein.

100.  Defendants owed Plaintiff a duty of care.  Defendants, each one of them independently and collectively, breached their duty of care to Plaintiff.  As a result of this negligence, Plaintiff has suffered and continues to suffer emotional distress.  This negligence is a substantial factor in causing Plaintiff serious emotional distress.

**JARRARD COMPLAINT**

101.  As a direct and proximate result of Defendants' and each of their negligence alleged above, Plaintiff suffered severe, substantial and enduring emotional distress, including humiliation, embarrassment, anxiety and indignity, in an amount which will be proven at trial.

PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF makes the following demand:

a)   That process be issued and served as provided by law, requiring Defendant to appear and answer or face judgment;

b)   For general, special, actual, compensatory and/or nominal damages against Defendant in an amount to be determined at trial;

c)   For punitive damages in an amount to be determined at trial sufficient to punish, penalize and/or deter Defendants and others from engaging in the conduct described herein;

d)   For back and front pay and other benefits Plaintiff would have been afforded but-for Defendant's unlawful conduct;

e)   For costs and expenses of this litigation;

f)   For reasonable attorneys' fees, where applicable;

g)   For pre and post-judgment interest on all damages and other relief awarded herein from all entities against whom such relief may be properly awarded; and

h)   For all such other and further relief as the nature of the case may require and the court deems appropriate.

Dated: September 12, 2019          **LAW OFFICES OF CLAIRE COCHRAN**

_____

**CLAIRE COCHRAN**
Attorneys for Plaintiff
NADINE JARRARD

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Dated: September 12, 2019          **LAW OFFICES OF CLAIRE COCHRAN**

_____

**CLAIRE COCHRAN**
Attorneys for Plaintiff
NADINE JARRARD

**JARRARD COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JARRARD COMPLAINT**